**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                 :
DRENEA RENEE RODRIGUEZ,          :    CIVIL ACTION
                                 :
              Petitioner,        :
                                 :
      v.                         :    NO. 08-5440
                                 :
MARIROSA LAMAS, et al.,          :
                                 :
              Respondents.       :
_____ :

ARNOLD C. RAPOPORT
UNITED STATES MAGISTRATE JUDGE

**REPORT AND RECOMMENDATION**

Drenea Renee Rodriguez has filed a Petition for Writ of
Habeas Corpus pursuant to 28 U.S.C. § 2254.  For the reasons that
follow, I recommended that the Petition should be denied with
prejudice and dismissed without an evidentiary hearing.  I also
recommend that there is no basis for granting a certificate of
appealability.

I.      **FACTS AND PROCEDURAL HISTORY**.[1]

Rodriguez was found guilty of first degree murder and
related charges after a bench trial.  The facts underlying the
convictions are lengthy.  They detail a crime spree that ended in
the gruesome deaths of Lucy Bourgeois Smith and her husband Terry
Smith.  Rodriguez descent into crime began on August 30, 2001

_____

[1]This information is taken from the Petition for Writ of
Habeas Corpus, the Commonwealth's Response and the exhibits
attached thereto.  The facts of Rodriguez's crime are taken from
opinion of the Pennsylvania Court of Common Pleas denying
Rodriguez's direct appeal.  (Resp. Ex. A).

when she, along with Landon May, Steve Estes, Michael Bourgeois, and Ray Navarro Perez, broke into the Ephrata Auto Connection and stole a 1995 Nissan Pathfinder.  They later abandoned the car after setting it ablaze.  After committing this crime, the group swore a literal blood oath at Rodriguez's home to never reveal each other's complicity to the police.  They next day, they committed a burglary at the home of Lloyd and Beverly Good, stealing several handguns and rifles.  After returning to Rodriguez's home, they decided to return to the Good home to steal more property.  First, however, they decided to steal two cars to use in the burglary.  So they returned to the Ephrata Auto Connection and stole a Toyota Tercel and a Nissan Sentra. The Tercel was quickly abandoned.

In the early morning of September 2, 2001, Rodriguez drove Bourgeois to the Good residence in her own car, while Estes and May drove the stolen Nissan.  They ransacked the home, stealing six more firearms, ammunition, hunting knives, a compound bow, three BB guns, cash, household items and a stuffed and mounted fox.  While Rodriguez and Bourgeois unloaded the items, Estes and May returned the Good home again, this time to steal the Goods' two cars, a Saturn and a Chevrolet Suburban.

Later that same day, Bourgeois and Estes committed an armed robbery of a Turkey Hill store.  May drove the get away car, which was the Saturn stolen from the Goods.  Rodriguez gave the

2

others clothing to wear for the robbery, masks, gloves, and two handguns taken from the Goods.  When the men returned to Rodriguez's home, they divided the proceeds of the robbery.

The Good robbery was discovered on September 3, 2001.  Later that day, Estes was stopped by police while driving the Suburban stolen from the Good's home.  The Saturn used in the Turkey Hill robbery was found abandoned the next day.  Items belonging to May were found in its trunk.  Finger prints belonging to Bourgeois were lifted from the Good residence.  Efforts to locate Bourgeois at his parents' home on September 5 were unsuccessful.

That night, Lucy Bourgeois Smith and Terry Smith went to the Rodriguez residence where Bourgeois had been living.  Bourgeois and Rodriguez became romantically involved after Bourgeois, aged 18, broke up with Rodriguez's daughter.  The Smiths told Bourgeois that the police were looking for him.

For several days prior to this encounter, and during the height of the crime spree, Bourgeois had talked about killing his mother and step father with Rodriguez, May and Estes because Lucy had been talking about sending Bourgeois to live with his father in Kansas.  The four agreed to kill Lucy and Terry Smith, to make it look like a robbery by duct taping the victims and stealing their ATM cards.  These conversations became serious after Estes was arrested.  Rodriguez feared that Estes would inform on the others, and she pressured Bourgeois to kill his parents, so they

3

might rob them and obtain the money to bail out Estes.  After the
Smiths' visit, Bourgeois announced to Rodriguez and May that he
was ready to commit the murders that night.  Rodriguez gave
Bourgeois and May the keys to her car and money to buy duct tape
and latex gloves.  She gave them two of the handguns stolen from
the Goods.

Several hours later on September 5, Bourgeois and May
returned to the Rodriguez home and told her that they had
committed the murders.  She put the two handguns back in her
dresser and May and Bourgeois put bloody knives, clothing and a
hammer in a trash bag in the laundry room.

The Smiths' disappearances were reported to the Ephrata
Police the next day, September 6, 2001, by Terry's coworkers when
he did not report for work.  After learning that Lucy's son was
possibly involved in the Good burglary, the police entered the
Smith home through an unlocked door, finding what appeared to be
two bodies wrapped in bedding.  Terry had been stabbed 47 times,
his neck was cut at least 5 times, he was shot at close range
five times, and he had been strangled or asphyxiated.  Lucy was
cut 51 times, shot in the head, beaten on the left side of her
head with a claw hammer, suffered blunt force trauma to her
forehead, and was eventually smothered to death.

Later on September 6, a Pennsylvania State Police Trooper
and an Ephrata Detective went to the Rodriguez home to interview

Bourgeois about the Good burglary.  During the interview, Bourgeois admitted that he and Perez had committed the burglary. He was subsequently arrested.  Police officers then interviewed Rodriguez.  She told officers that she allowed Bourgeois to use her car, but that he had not been out of her sight for more than a half hour during the past few weeks.  She also told the police that Perez had bragged about killing people, threatened Bourgeois, and then offered to kill his parents.  She denied having a sexual relationship with Bourgeois.  She also told police that May had shot a cop in New Jersey and that was why he was staying in Ephrata.

After interviewing Rodriguez, the police asked May, who was also present in the home, to come to the police station to be interviewed.  May admitted to being involved in the Good burglary and gave a statement in which he confessed to participation in the killing of Terry and Lucy Smith.  Based on this information, a search warrant for Rodriguez's home was obtained.  In a garbage bag in the laundry room police found the bloody clothing worn by Bourgeois and May; three bloody knives; a bloody claw hammer; Terry Smith's wallet; a purse with a cell phone, and credit cards belonging to Lucy and Terry; a role of duct tape; spent ammunition casings; and a box filled with personal items belonging to Lucy and Terry.  Cash taken from the Smith home was also found in the kitchen.  The search also turned up items from

5

the Good home, including the stuffed fox and a canvas bag with the name "Good" embroidered on one side.  Many of the firearms stolen from the Goods were found in Rodriguez's attic.

The two firearms used to kill the Smiths were not found in the initial search.  Rodriguez had enlisted two teen aged girls and her daughter to hide them in the attic.  On September 7, two juvenile boys who frequented the Rodriguez home and Rodriguez's daughter were sent to clean up the attic.  Rodriguez directed them to dispose of the guns using latex gloves and to wash the guns to remove finger prints.  One gun was buried in a cornfield; the other was placed in a pizza box, wrapped in tape and placed in a dumpster.  The police, who had received a report about suspicious activity around the dumpster, recovered the gun and identified the two juvenile boys, who led them to the other gun.

On September 12, Rodriguez was arrested on charges of receiving stolen property.  After being Mirandized, she admitted to involvement in the Ephrata Auto Connection robberies, but continued to deny a sexual relationship with Bourgeois and reiterated her alibi for him in the Smith murders.  In a subsequent interview, Rodriguez admitted her involvement in the Good burglaries.

Several months later, on January 4, 2002, police interviewed Navarro Perez.  He implicated Rodriguez and Bourgeois in the Smith murders.  He told police he heard them plan the murder

along with May and Estes; that Rodriguez told Bourgeois to steal everything in the home and duct tape the victims; and that Rodriguez had told him that she was outside the Smith home in the car while May and Bourgeois committed the murders.  Thereafter, Estes also told police that Rodriguez, Bourgeois, May and Perez planned the murders; that Rodriguez said she would drive them to the Smith home and told the others to take anything of value; and that Rodriguez and Bourgeois were involved in a sexual relationship.  Based on this information, Rodriguez was charged with two counts of first degree murder, criminal solicitation, and conspiracy.

Following a bench trial in which Bourgeois testified for the Commonwealth as part of plea deal that spared him the death penalty, Rodriguez was convicted on all charges.  Rodriguez had waived a jury trial in exchange for the Commonwealth's agreement not to seek the death penalty in her case as well.  On direct appeal, Rodriguez argued that the evidence was insufficient to support the two convictions for first degree murder, and that the trial judge erred in denying her pretrial motion to suppress statements she gave to police on September 12 and September 18, 2001.  In an opinion dated June 15, 2004, the Pennsylvania Superior Court denied her direct appeal.  (Resp. Ex. B.)  Her petition for allowance of appeal was denied by the Pennsylvania Supreme Court on November 3, 2004.  (Resp. Ex. C.)

7

Petitioner filed a timely petition in state court pursuant to the Post Conviction Relief Act (PCRA), 42 Pa. Cons. Stat. Ann. § 9541, on June 24, 2004.  She alleged in her petition that trial counsel was ineffective for failing to prepare for the penalty phase of her capital murder trial and for not moving to quash the Commonwealth's notice of aggravating circumstances, which led her to waive her right to a jury trial; for not objecting to allegedly leading questions; for not objecting to evidence of other bad acts; for not calling her parents as character witnesses; for failing to effectively cross-examine Commonwealth witnesses; and for not requesting the recusal of the trial judge. In an opinion dated August 24, 2007, the Court of Common Pleas denied the petition.  (Superior Court Brief for Appellant, Ex. B.)  That opinion was affirmed by the Superior Court on June 13, 2008, and the Supreme Court denied Rodriguez's petition for allowance of appeal on October 29, 2008.

On November 13, 2008, Rodriguez filed her federal habeas petition, asserting three claims that the Commonwealth concedes have been properly exhausted: 1) that trial counsel was constitutionally ineffective for not moving to quash the Commonwealth's notice of aggravating circumstances, which induced her into waiving her right to a jury trial in exchange for the Commonwealth's agreement to withdraw its demand for the death penalty; 2) that counsel was ineffective for failing to object to

8

the prosecutor's use of leading questions; and 3) that counsel was ineffective for failing to call her parents as character witnesses.

## II.   <u>**DISCUSSION**</u>

I analyze these claims according to the precepts of Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) which altered habeas review of state convictions brought under § 2254.  Under AEDPA, a petitioner must demonstrate that the state court's adjudication of the merits "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."  <u>See</u> <u>Penry v. Johnson</u>, 532 U.S. 782, 792-92 (2001) (explaining two-prong standard); <u>Williams v. Taylor</u>, 529 U.S. 362, 403-04 (2000) (same).  Additionally, state court findings of fact are to be presumed correct unless the petitioner rebuts the presumption with clear and convincing evidence.  <u>See</u> 28 U.S.C. § 2254(e)(1).  This presumption applies even if the finding was made by a state court of appeals rather than by the state trial court. <u>Bragg v. Galaza</u>, 242 F.3d 1082, 1087 (9th Cir.), <u>amended</u>, 253 F.3d 1150 (9th Cir. 2001).

The Supreme Court has said that "a state court decision will be 'contrary to' our clearly established precedent if the state court either 'applies a rule that contradicts the governing law set forth in our cases,' or 'confronts a set of facts that are

materially indistinguishable from a decision of this Court and
nevertheless arrives at a result different from our precedent.'"
Penry, 532 U.S. at 792 (quoting Williams v. Taylor, 529 U.S. 362,
405-06 (2000).  A state court decision is an unreasonable
application of the Supreme Court's precedent if the court
"correctly identifies the governing legal rule but applies it
unreasonably to the facts" of the case.  Id.  AEDPA's general
rule of deference applies even if the state court does not cite
to the applicable Supreme Court decisions, or even demonstrate an
awareness thereof, so long as neither the reasoning nor the
result of the state court decision contradicts them.  Early v.
Packer, 537 U.S. 3, 8 (2002); Woodford v. Visciotti, 537 U.S. 19
(2002).

The clearly established Supreme Court law governing claims
of ineffective assistance of counsel is Strickland v. Washington,
466 U.S. 668, 687 (1984), wherein the Court established a
two-pronged test to evaluate Sixth Amendment claims of
ineffective assistance of counsel.  An individual making such a
claim must show: (1) that "counsel's performance was deficient,"
which is measured by "reasonableness under prevailing
professional norms;" and (2) that counsel's "deficient
performance prejudiced the defense." Id. at 687-90.

The Pennsylvania standard for ineffective assistance, i.e.,
that to show ineffective assistance a petitioner must show that

10

the underlying claim has merit, that counsel had no reasonable
basis for his conduct, and resulting prejudice (meaning that the
outcome of the proceeding would have been different) see
Commonwealth v. Todaro, 701 A.2d 1343, 1346 (1997), is materially
identical to the test enunciated in Strickland.   See Werts v.
Vaughn, 228 F.3d 178, 203 (3d Cir. 2000).   Therefore, "the
appropriate inquiry is whether the Pennsylvania courts'
application of Strickland to [petitioner's] ineffectiveness claim
was objectively unreasonable, i.e., the state court decision,
evaluated objectively and on the merits, resulted in an outcome
that cannot reasonably be justified under Strickland."   Werts,
228 F.3d at 204.   I recommend that the state courts' application
of Strickland to Rodriguez's three claims was not unreasonable.

    A.   Failure to move to quash the Commonwealth's notice of
         intent to seek the death penalty.

    In addressing the first issue, that counsel was ineffective
for failing to move to quash the Commonwealth's notice of intent
to seek the death penalty, which Rodriguez contends compelled her
to waive her right to a jury trial, the PCRA Court held that
Petitioner could not have prevailed under state law, even if such
a motion had been filed:

> Defendant could not have demonstrated the absence of
> any evidence to support an aggravated circumstance
> since evidence of the double homicide would have been
> sufficient under [Commonwealth v. Buck, 709 A.2d 892
> (1998)] to permit the case to proceed as a capital
> case. . . .   Accordingly, had counsel filed and

> litigated the penalty phase pre-trial motions,
> Defendant would not have been entitled to relief.
> Since her motions lacked substantive merit, Defendant
> could not have been prejudiced under the circumstances
> and she cannot establish the elements of her claim for
> post conviction relief.

(Superior Court Brief for Appellant, Ex. B. at 18-19.)  The PCRA court also found that the Commonwealth had stated two viable aggravating circumstances available to it at the time Rodriguez waiver her right to a jury trial.  (Id. at 16.)

Because any pre-trial motion Counsel may have filed to quash the Commonwealth's notice of aggravating circumstances would have lacked substantive merit under state law, that failure cannot constitute ineffective assistance under the Strickland standard. Counsel cannot be deemed to have violated professional norms by failing to raise a substantively meritless issue.  See Bolender v. Singletary, 16 F.3d 1547, 1573 (11th Cir. 1994) (failure to raise non-meritorious issues does not constitute ineffective assistance of counsel); Thomas v. United States, 951 F.2d 902, 904 (8th Cir. 1991) (defense counsel not ineffective for failing to raise meritless objections); Sweet v. Tennis, Civ. A. 07-5349, 2008 WL 4372851 (E.D. Pa. Aug. 18, 2008) (same).  Accordingly, the state court's adjudication of the issue was not an unreasonable application of Supreme Court law.[2]

---

[2]Additionally, I note that the state courts have determined that the jury trial waiver was knowing and voluntary.  Penalty phase Counsel testified at the PCRA evidentiary hearing that he explained the death penalty aggravating factors to Rodriguez, as

    B.    Failure to object to leading questions.

    Rodriguez next argues that counsel's failure to object to leading questions posed by the prosecutor during the re-direct examination of Michael Bourgeois constituted ineffective assistance.  On cross-examination, liability phase counsel questioned Bourgeois extensively regarding his motivation to testify, and that he agreed to testify against Rodriguez in exchange for the Commonwealth's agreement to drop the death penalty against him.  He was also impeached on the ground that he had lied to the police and would do anything to suit his needs.  (Id. at 24 (citing trial transcript).)  The leading questions posed by the prosecutor were an attempt to rehabilitate

---

well as the fact that the Commonwealth's notice could be challenged, although success was not guaranteed.  (Superior Court Brief for Appellant, Ex. B. at 20 (citing PCRA transcript).)  Counsel testified that, in addition to eliminating the possibility of the death penalty, he informed Rodriguez of other considerations that influenced his recommendation that she waive a jury trial, including that the facts of the case were particularly gruesome, and that a judge, rather than a jury, would not be as affected by such matters.  (Id. at 19-20 (citing PCRA transcript).)  Counsel initially advised Rodriguez to plead guilty to murder generally and contest the level of her culpability, but Rodriguez would not accept his recommendation.  Then, after a lengthy discussion on the eve of trial, he discussed with Petitioner the option of waiving a jury trial in exchange for the Commonwealth's offer to forego the death penalty.  Counsel testified that Rodriguez agreed, executed a waiver form, understood the contents of the form, and signed it voluntarily without any threats, coercion or pressure.  (Id. at 21 (citing trial and PCRA transcripts).)  Based on this testimony, and the fact that the trial court had conducted a complete colloquy prior to accepting Rodriguez's jury waiver, the PCRA court credited the account of counsel that the waiver was fully informed and voluntary.

Bourgeois.  (<u>Id.</u>)

Liability phase counsel testified at the PCRA hearing that he did not object to the leading questions because the case was being tried to the bench, and that he was, therefore, not concerned with mistakes that could have led to prejudice in a jury.  (<u>Id.</u>)  He testified he only objected to leading questions if he thought they would elicit information that could cause the defense a problem; that he did not believe the questions were offensive, prejudicial or objectionable; nor did he believe they were harmful.  (<u>Id.</u>)  Furthermore, he testified that any leading questions could have been reworded to obtain the same information.  (<u>Id.</u> at 25.)  Based on this testimony, the PCRA court concluded that Rodriguez failed to establish prejudice as a result of counsel's failure to object to the leading questions, finding that much of Bourgeois's testimony was corroborated by other witnesses.  (<u>Id.</u>)

I find that this conclusion was not an unreasonable application of the <u>Strickland</u> standard.  The PCRA court's decision to credit counsel's testimony that he had a reasonable explanation for his failure to object to the leading questions is a finding of fact entitled to the presumption of correctness. Rodriguez has failed to rebut the presumption with clear and convincing evidence.  <u>See</u> 28 U.S.C. § 2254(e)(1).  In addition, because, as counsel recognized, the leading questions could

14

easily have been reworded to elicit the same testimony, Rodriguez

cannot show prejudice arising from the failure to object.

     C.    Failure to call character witnesses.

     Finally, Rodriguez argues that counsel's failure to call her

parents as character witnesses during the liability phase of her

trial constituted ineffective assistance.

     The decision of whether to call character witnesses is

generally a strategic choice made by counsel, and therefore is

entitled to a "heavy measure of deference." Strickland, 466 U.S.

at 690-91. Counsel's failure to investigate potential witnesses

can amount to ineffective assistance of counsel. United States

v. Gray, 878 F.2d 702 (3d Cir. 1989). This principle is derived

from the Strickland mandate that "counsel has a duty to make

reasonable investigations or to make a reasonable decision that

makes particular investigations unnecessary." Strickland, 466

U.S. at 691. However, "trial counsel is not bound by an

inflexible constitutional command to interview every possible

witness. Instead, counsel [is] simply required to exercise

reasonable professional judgment in deciding whether to interview

[a witness]." Lewis v. Mazurkiewicz, 915 F.2d 106, 113 (3d Cir.

1990).

     In order to claim ineffectiveness for failure to call a

witness under Pennsylvania law, a Petitioner must establish that:

(1) the witness existed; (2) the witness was available; (3)

counsel was informed of the existence of the witness or counsel
should otherwise have known him; (4) the witness was prepared to
cooperate and testify for Appellant at trial; and (5) the absence
of the testimony prejudiced Petitioner so as to deny her a fair
trial.  Commonwealth v. Todd, 820 A.2d 707, 712 (Pa. Super. Ct.
2003).  Applying this state law standard, the PCRA Court found
that,

> The Commonwealth and PCRA counsel stipulated that two
> witnesses, Darlene and Jay Stiles, Defendant's mother
> and adoptive father, would have testified that they
> were familiar with Defendant's reputation in the
> community and that she had a reputation for being
> peaceful and law abiding . . . .
>     Trial counsel testified that he did not recall
> having any character witnesses on Defendant's behalf
> who were aware of her reputation in the community and
> who would be able to establish their base of knowledge
> for that community reputation. . . .  Trial counsel
> testified that he made it clear during his opening
> statement and closing argument that Defendant did not
> have a prior record.
>     Counsel indicated that he was aware of the
> pitfalls of character testimony and the possibility of
> rebuttal with negative character testimony.

(Id. at 28-29 (internal citations to the PCRA transcript
omitted).)  Liability phase counsel stated at the PCRA
evidentiary hearing, "[w]hat was a character witness gonna do for
me after she confessed to being up to her neck in burglaries and
car thefts and having all this stuff in her house?  I mean, with
all due respect, it's kind of absurd."  (Id. at 29 (citing PCRA
transcript).)

Based on the stipulation and the testimony, the PCRA court

accepted that Rodriguez's parents were available to testify as
character witnesses, but that Petitioner failed to show that her
attorney rendered ineffective assistance in deciding not to call
them.  The court found that, as the two witnesses were
Rodriguez's parents, their testimony would have carried little
weight and their bias would have been obvious; calling them as
character witnesses would have allowed rebuttal evidence which
could have harmed Petitioner's case; and, in light of the
physical evidence, there was no reasonable probability that the
outcome of the case would have been different had character
witnesses been called.  Id. at 29-30.

I recommend that Counsel's decision not to call Petitioner's
parents as character witnesses was a strategic trial decision
that is entitled to great deference.  Strickland, 466 U.S. at
689.  I also recommend that the PCRA court's prejudice
determination, i.e., that the overwhelming weight of the physical
evidence rendered the failure to call character evidence
superfluous, is a reasonable application of the prejudice
requirement of Strickland.  See, e.g., United States v. DeJesus,
57 Fed. Appx. 474, 478 (2d Cir. 2003) (holding that trial
counsel's decision not to call a character witness was grounded
in a strategy of preventing the prosecution from attacking
defendant's character and therefore was "inherently tactical,"
"generally should not be disturbed," and was not found to be

17

"objectively unreasonable" under <u>Strickland</u>).   Accordingly, I recommend that this claim be rejected.[3]

For these reasons, I make the following:

_____

[3]I note that the Commonwealth responds an additional issue that Petitioner has not actually raised in her federal petition, namely that counsel was ineffective for not objecting to evidence of other bad acts.  (Resp. at section A-4, B-4.)  This evidence included testimony about Rodriguez's drug use, her failure to evict residents from her home who committed crimes with which she was not involved, her failure to prevent Bourgeois from committing crimes, her introduction of certain drugs to Bourgeois, and her failure to instruct him to return to live with his parents.  (Superior Court Brief for Appellant, Ex. B. at 27.) The PCRA court concluded that this evidence was properly admitted under state law to show Rodriguez's relationship to the other occupants of her residence, because it formed part of the history of the case and the natural development of the facts, explained why Petitioner would discuss the preparation and commission of numerous crimes, including murder, with individuals with whom she otherwise appeared to have little connection, and was relevant to the credibility of Bourgeois.  Because the evidence was properly admitted under state law, even if Rodriguez had intended to raise the claim in her federal petition, she could not have shown that the failure of counsel to object thereto constituted ineffective assistance.

## RECOMMENDATION

AND NOW, this 27th day of May 2009, IT IS RESPECTFULLY RECOMMENDED that this matter should be DISMISSED without an evidentiary hearing.  I further RECOMMEND that there is no probable cause to issue a certificate of appealability.

The Petitioner may file objections to this Report and Recommendation.  <u>See</u>  Local Civ. Rule 72.1.  Failure to file timely objections may constitute a waiver of any appellate rights.

                              BY THE COURT:


                               /s/ Arnold C. Rapoport
                              ARNOLD C. RAPOPORT
                              UNITED STATES MAGISTRATE JUDGE

19